The first case this afternoon is No. 06-1017, Plumtree Software v. Datamize. Mr. Stevenson. May it please the Court. The Court should reverse the summary judgment of invalidity under the on-sale bar, and perhaps the clearest indication of error deals with the apparatus claims that are presently at hand. The District Court errs— Could you help me understand what's going on here? Because I wasn't sure after reading the briefs what the facts were. He promised to set up this kiosk at the trade show, right? Yes. The inventor. And the kiosk, as I understand it, is sort of an interactive thing where people can come in and punch in a ski trail that they'd like to go down and see what it looks like, something like that. Yes. And he agrees that he used the patented software to create the kiosk to be shown at the show, right? He used it, but it wasn't required by the contract. Right. Yes. But if he used it before the critical date, even if it wasn't required by the contract, that would be an on-sale bar, right? But it wasn't used before the critical date. No, no, but that's right, right? Yes. Well, I'm not so sure about that either, Your Honor, because, for instance, for the apparatus claims— No, I'm just talking about the method claims. I think if the contract is silent on the method by which the kiosks are going to be manufactured and the point of the contract isn't that he is actually selling the authoring— No, forget about the contract. Let's assume that he actually uses the patented software to create the kiosk, and he does that before the critical date. Then the on-sale bar applies, right? As to method claims? Yes. In other words, he's practicing the method, hypothetically, assuming for commercial purposes here. Well, I think there's a distinction there, though. If you look at the D.L. Auld case that is in the briefs, that's a case where the patent owner used his patented method secretly and sold an article, I think a chrome-plated badge or something, and that was held to be use of the invention in commercialization. However, in this case, there was never a sale of the actual kiosk system. But Scaltech assumes that performing the process, the patented process for money, would meet the on-sale bar. That's correct. It does. But Scaletech is different because in Scaletech there was actually a contract to perform the method. Well, I understand, but there are two possibilities here. One, that the contract required him to perform the method, and I understand your contention the contract didn't cover that. And that's a good argument because the contract is pretty general. The other problem would be if he actually did perform the method before the critical date, and that might also be an on-sale bar. But there's also evidence here that the kiosk itself somehow incorporated the authoring software. That's what I'm confused about. And I think that is, at best, an ambiguous point. I don't think the kiosk itself is the invention. The record is clear on that. The invention is the contract. Well, I understand the kiosk is not the invention, but the kiosk could have incorporated the authoring software. In other words, the kiosk could have been used to demonstrate the authoring software. Here's a kiosk, step up to the kiosk, you can change the kiosk using this authoring software. Do we know whether that happened or not? Under the record, there isn't any evidence that the kiosks actually have that feature. What's being referred to by Mr. Burns in his deposition is that you could put in the kiosk the ability to reconfigure it on the fly. But the record is silent as to whether that feature was in the kiosk system that was done for the ski industry of America. There's no evidence that that was, in other words, a feature of the kiosks that were actually used in the trade show. Go ahead. I have a question. The ski industry of America, that is what exactly? Is it a trade association for the ski industry? Yes, Your Honor. And what does it do? Does it provide anything for the members? Does it suggest to them they should use particular products? Or does it do what most trade associations do, which is just try to further the interests of the industry? I think it does the latter. I think what they do is they put on a trade show every year where avid skiers… They put on a show. That we know. The reason I raise the issue with you is if this is just a trade association, I find it difficult to see how a contract under which somebody agreed to display some stuff at a trade association that would be of interest to the ski industry could be deemed as putting that product on sale at the time there may be agreement to participate in the show. Because I gather it's common ground that since the show took place within the critical one-year period, what happened there isn't enough to show, to satisfy the on-sale bar. Yes, that's exactly right. The show occurred less than a year before filing, and the agreement that was going to result in renting space on the floor took place outside of the one-year period. And I agree wholeheartedly with Your Honor that this really isn't the type of commercial event or commercialization that really ought to trigger application of the on-sale bar. It was the rental space at a trade show, and certainly the patent owner got a discount, possibly even because the organizers of the trade show thought the invention was interesting or nifty. But it really isn't the type of commercialization that I think the policy of the on-sale bar is aiming at preventing. That's quite a narrow line to draw though, isn't it? If, in fact, we were to accept that when the deal was made that he would proceed in order to be available to display during the show, if that was some sort of a sale, you're asking us to draw a distinction between the entities that were party to the transaction as to whether one might have been a customer for the product and the other an organizer for display? Well, that's really not the precise line that I'm trying to draw. The line more is between what's a jury issue, which should avoid summary judgment, and what, on the other hand, is a clear and convincing evidence as a matter of law in invalidating an event. And in this case, my point is that if somebody goes to a trade show and just obtains a discount in the fee for renting space, that that's not a commercial sale. And to hold that it is, especially as a matter of law, this isn't a jury verdict. This is a summary judgment. If you say that as a matter of law, then what happens if, for instance, an inventor goes to a trade show and because they like his invention, maybe he gets parking or he gets free help in setting up his display? All of a sudden, that can of worms is going to be opened, and every defendant in every patent case is going to be looking for even the slightest marginal thing that they can call consideration to try to raise a non-sale bar. Are you saying basically, I think is what your argument is, that the agreement was not in any way an offer of sale? All of the most the agreement was, was an agreement perhaps to make an offer of sale at some future time, i.e. at the trade show. That is what they said was, we'll exhibit it at the trade show, and then at the trade show, presumably, people come around and look at it and say, that's good, I'd be interested in it. But you say that an agreement, this was not an agreement or an offer of sale, this was at most an agreement to make an offer of sale at some future point. Well, and your honor, it's not even that because when they went to the trade show with the kiosk system, they weren't even offering that for sale. All that was doing was populating a concept store, the ski store of the future, as a neat way you can get information on skis and so forth through these computer screens, these touch screens. But the reality is, if you went to that trade show, after the critical date, you couldn't buy those kiosks. Wait a second. Surely you agree that if they had been paid monetary consideration to produce a kiosk for the trade show using the authoring software, and that that had happened before the critical date that the on-sale bar would have applied. That's scale tech. If somebody contracts with the patent owner and says, we will pay you money or we will give you monetary consideration that is a commercial value to practice your invention for us, practice your method, then I will agree that's scale tech and the court has held that's an on-sale bar. But that isn't what happened here because, again, the contract was silent on how the kiosks were going to be manufactured. Well, except that you have the problem that if he was actually doing, creating the kiosk before the critical date using the authoring software, and he was doing that for commercial purposes, that would seem to be within the on-sale bar. Well, but, Your Honor, if you look at the Tech Air and the, well, primarily the Tech Air case, that one is really to the contrary of that. In that case, that was a fan case in the balancing plugs, and there was an offer to sell the fan before the critical date. And the issue was, was it going to have the inventive novel balancing plugs or was it going to have the old, you know, unpatented balancing plugs in it? And when it came right down to it, the patent owner delivered the fan with the novel inventive balancing plugs, but the court held there wasn't an on-sale bar. I understand what you're saying, and that's correct, and that's the problem with the contract here because it doesn't specify really whether the authoring software is going to be used to produce the kiosk or not. But if in fact, if in fact before the critical date he did use the authoring software to produce the kiosk and that was done for pay, that's within the on-sale bar, right? Well, that's where I'm drawing a distinction, Your Honor, between Scale Tech and the other cases, and Tech Air. But having said that, Your Honor, it's probably an issue that becomes irrelevant given that the evidence clearly shows that the authoring tool wasn't used until literally the day of the trade show. Now, where does the record show that? The evidence is in Mr. Burns' declaration, and I'll give you the record for that. That is, I believe, A349. 349? Excuse me. I apologize, Your Honor. A530 is the declaration, and the specific site is A531. Which paragraph? It's paragraph 6. And at the bottom he says he brought his own kiosks to the show and completed the programming of the ski path on the first or second day of the trade show working around the clock. And in fact, the product wasn't even completed. I think they missed the first day of the trade show because they couldn't get the kiosks up and running in time. That seems to me ambiguous as to whether he was using the authoring software. He may not have completed it until the first or second day of the trade show, but he does not say in this affidavit that he didn't use the authoring software before the critical. That's correct, Your Honor, and I would observe, based on Your Honor's observation, that if that is the case, that that militates in favor of reversal of the summary judgment because the defendant has the burden of proof by clear and convincing evidence. I understand, Your Honor. Was the kiosk necessary for this, if you want to use a colloquial invention, for this invention to function? In other words, you could do it without a kiosk. You could just take a thing and go to some computer screen and put in what had to be put in? Yes, the kiosk is the end product, but it's not the only end product. The authoring tool is a software program that creates other software programs. You can create, using the inventive authoring tool, kiosks or other types of software programs that have certain features related to customization and personalization of content. Okay, let's save your rebuttal time and let's hear from the other side. Mr. Levin. Afternoon. May it please the Court? This case is on all fours with scale tech. As Your Honor pointed out, they undisputedly used the computer. Well, but the problem is the contract – I have a hard time reading this contract as requiring the use of the authoring software, which would be – that would bring it under scale tech if that happened. I have a really hard time reading the contract that way, but you do have an alternative argument that they actually used the authoring software for commercial purposes before the critical date, so address that if you would, both of those. I think you're correct under either theory. First on your hesitation about using the contract itself. The contract was formed after SIA agreed to the terms in the proposal of January 17th. That's in the record at 8209. If you look at 8214, under product differentiation technology, the very first bullet point is proprietary authoring tools, and the agreement talks about using the system that Multimedia Ventures had talked about at this January 17th meeting. So when Mr. Travis of SIA accepted the proposal in his January 25th letter… What did they do that constituted a sale or an offer of sale? What was it that they undertook to do that would constitute a sale or an offer of sale? I take it what it was basically was they said, we're going to display it at the trade show. Is that it? Well, that's not all there was to it. What exactly did – that's what I'm troubled about. The letter itself at 8227 talks about what was being done in lieu of waiving the $10,000. It does involve bringing an interactive kiosk system and providing it for the benefit of SIA in their concept store to show how avant-garde this organization was. But it also talked about, more importantly, using sponsors' content, integrating that content into the kiosk system. So the patent itself is about using an authoring tool, taking third parties' content and putting it into an advertising device. Now, the contract required Multimedia Ventures to take other sponsors of SIA, put their content onto the kiosk using their proprietary authoring tool. Mr. Burns at, I believe, 346A admitted that they had one tool. So clearly the contract contemplated using their one system. The patent system is described in detail in the specification. Why is that – how can that be clear at this stage on the face of the contract? I just don't understand that. I mean, the contract is very general. You refer to this proprietary software, but how do we know that that's proprietary software that satisfies all the limitations of the patent? I mean, that's just – it seems to me mush. I think there's two answers to that, Your Honor. I think, first of all, the case law that talks about the ambiguities between whether the offer relates to the invention, both Techcare and Spartan, are clearly distinguishable because in both of those cases there was some alternative that was contemplated by the offer. Here there was no alternative. They demonstrated their proprietary system. There was one system. They admitted there was one system. They admitted they used the system, which addresses the second point Your Honor made. But I don't understand how the contract required them to use the system with all the limitations of the patent. That's why I'm having a lot of trouble. I don't believe there's any requirement. If you have a sale or an offer for sale, that the offer letter in detail go through every element of the specification. But I think it has to require you to use the patented process, and that's what I'm having trouble. I don't see that this contract was that specific as to require use of the patented process. So you do have the other argument that they actually did use the software before the critical date, but as to that one, I don't see that the record is clear enough for you. I believe again that the January 25th letter says to use the system that was demonstrated. That was a proprietary system that was discussed in the January 17th proposal. The only system they had, there was no notion like in Spartan where they hadn't even come up with the invention yet that they might be talking about some alternative that wasn't infringing. In terms of sort of identifying that the actual, all the steps were performed of all the claims, on summary judgment all you can do is look at the record and have an undisputed record that Walker properly found that the only attempt to create an issue of fact was a direct contradiction of Mr. Burns' multiple unequivocal admissions at his deposition that both the tool itself embodied all of the claims, that he used the tool to create the ski path kiosk, and that the kiosk itself that they brought for SIA to the show embodied all of the claims. Yeah, but what he didn't admit is that he used the authoring software before the critical date because the show was after the critical date. That's your problem. He said they set up the kiosk, they had some problems with the kiosk at the show, but they certainly, I think they've admitted it in the record. We don't know because the problems bridged the period before the show until after the show and we don't really know whether that which had to be changed or remedied or whatever during that period was a material aspect of the claims or not, do we? We don't have a case here like some of the other cases about ready for patenting where they were finishing up and experimenting. The answer is we don't know, right? Well, we have an admission both in deposition and interlocutory responses and in their own statements that they had reduced to practice all the claims in their own… But we don't have an admission that he used the authoring software before the critical date. I think the admission is at 3.49 is that Ski Path was created with the authoring system that we've been talking about. Is it fair to say that? So I think at 3.49 he admits that. Where does he admit it on 3.49? Was Ski Path created with the authoring system that we've been talking about that was reduced to practice in December of 1994? Yes. Well, it doesn't say when. It could have been in early March. We don't know. Suppose in this case, after all the agreement was entered into, Datamage just didn't show up at the trade show. Suppose Datamage, you know, the trade show opened, there was no sign of Datamage. They didn't even appear there. Would you still claim the product had been on sale? Skiltech involved an offer that was never accepted. Here we have not just an offer, we have an agreement. Where's the evidence? That makes no difference to your argument, does it? It makes no difference. This was about a sale that occurred in January of 1995. The fact that they didn't complete the Ski Path kiosk until the first or second day of the show in March, a week after the critical date, is immaterial. The question is, was there a reduction to practice or other ready for patenting? They admit there was. That was in December of 1994. Was there a commercial offer? There was. There was a January of 1995 agreement, both to perform and use the tool, as well as to bring a result of using the tool, Ski Path. And the identity was admitted at Kevin Burton's deposition, putting aside the sham declaration that Judge Walker promptly excluded. Those are all you require for under FAF. So the notion of whether the thing was completed or whether it was used on a particular date, I think that's a red herring. I'm still not clear under the statute. Your contention is that as a result of this agreement, the patented process, if you want to call it a method or so on, was offered for sale or was sold? Both. Both? There was a consummated contract. It was offered for sale to whom? To SIA. To the Ski Association? Yes. SIA wanted to... Do they purchase such things? I would think not. Well... I mean, it would seem to me that if you... That's what I find troublesome. They're offering it and they're selling it to the skiing people. They're selling what? The right to use this invention? I think this falls under both Scale Tech and Minton. Under Scale Tech, they're selling the method by selling the use of a tool that performs the method. And, in fact, they did perform the method. Secondarily, under Minton, if you agreed to provide a computer system that performs the method, that would also qualify. I think you don't even need to reach Minton because under Scale Tech... That's quite a strain. Does your case turn on our agreeing with you that that's the law? That Scale Tech and Minton? That selling something which will perform a method or other methods is a sale of the method itself, of a specific patented method? I mean, does your case turn on that? I don't think we're asking for any radical departure. We're just asking for a straightforward application. Well, these are very fact-specific cases in terms of whether, for example, the tool is capable of performing only this method or other methods. But doesn't your case have to be that what was sold was the specific method, the only method that they had, and the method that they eventually used? I think our case is satisfied if there's no dispute that the method that was being offered to be performed for SIA was the patented method. There's no evidence in the record that suggests it was anything but that. And in cases where you have some ambiguity because there's some other method, you can have a dispute about whether it was the patented method. Here, they had one tool. He admitted that at his deposition. They showed the tool at a demonstration, and they agreed to use the tool. They used the tool. They performed the methods. They admitted that the tool embodied all the claims. They admitted that the end result embodied all the claims. But they sold a method which didn't work. So you're saying that it embodies every limitation of the claim even though it didn't work, couldn't be made to work, wasn't made to work until after the critical date? Well, they didn't say that the offering tool doesn't work. They said the offering tool was reduced to practice in December of 1994, that they used the offering tool, but that the end result product was still being tweaked in the last day of the show, which was a week or two after the critical date. I think that's a red herring because this isn't about reduction in practice. That's admitted. But the real problem, and that which was established in the FAF case, which established the ready for patenting, was that it had to be at the stage at which, in fact, it was operable. Well, in fact, it didn't have reduction to practice. You had a very detailed set of drawings. Here you have an admission, both in interrogatory responses, deposition, and their briefs, that they had a complete reduction to practice in December of 1994. That is not disputed. They don't dispute that even in the Kevin Burns declaration below. But it didn't work in the kiosk when it was put on display, so how could it? I mean, that's still a leap to what's invalidated. Under STX v. Brine, if you agree to sell somebody something but the thing isn't completed or the actual sale or delivery doesn't occur until after the critical date, that's immaterial. The question is, at the time of the sale event, which is January 1995, about a month before the critical date, was there, A, a completed embodiment? They admitted that occurred in December 1994. B, was there a commercial sale? I would say under Scale Tech, this is a commercial sale. But it didn't work. So how can it really be ready for patenting, even if the inventor thinks it is, if it doesn't work? Again, there's two things. There's the tool, which did work. They never disputed that the tool worked. There's one particular thing that they created with the tool, the ski path kiosk that they brought to the show. But that's what was sold. Both of them were sold. The use of the tool was under Scale Tech, the method that they were performing. So that's independent of the end result. We're not arguing under Alt that this was simply a thing like an emblem that was created using the method that was sold. We're talking about an agreement to, for example, process sludge. Instead of processing refinery waste, this was processing content from SIA sponsors for the benefit of SIA to put it into their existing proprietary system, which was completed in December 1994. And they undertook to do that in January 1995. They did that. And while there might have been some bugs in the software the last few days, those bugs are not about the embodiment that was sold. It was about a result of the use of that embodiment. And I want to be sure I understand this. And under your theory, even before the trade show, the trade association had the right to practice this method? The trade show? Because I thought you told me that the agreement constituted both a sale and an offer of sale. And if it would constitute a sale, obviously they must have had the right to practice the invention. This wasn't a transfer of the know-how. This was more like Scale Tech, where the process was being done internally at Multimedia Ventures for the benefit of SIA, using SIA sponsors' content. So there was no transfer of the process or even the know-how. It was kept secret, just like in Scale Tech. But the second aspect of the on-sale bar, which you don't even need to reach, is that they also agreed to provide ski pack at the show. That didn't occur until after the critical date under this court's jurisprudence. That doesn't matter. As long as the agreement or the offer was before the critical date and there was a reduction of practice, which they admit, then you've met all the elements of fat. So I think the case of Spartan and Taggart, if you look at them, they're very factually distinguishable. In Spartan, there wasn't even a conception at the time of the offer. So the notion that there was an offer of the invention in that case couldn't have been. It didn't exist yet. Here, they had one invention. They came up with it in December of 94. That was what they talked about. That's what's shown in multiple pages of the slides in January of 95. That's what the agreement contemplates. That's what they used. So I don't know where the fact issue could be, since there's no other invention that they could possibly have substituted. They required them to use the methods. There were no other methods. It doesn't matter that SIA didn't know how it worked or didn't really care how it worked. They wanted the newfangled thing using sponsor's content. That's what they got. That's what they agreed to. I think a simple application is guilty. Okay. Thank you, Mr. Levin. Thank you. I'd like to make some factual points in response to what we just heard. First, the issue of when did the work on Ski Path begin using the authoring tool. It's unclear from the record. But what's clear from the record is it did not begin right away. At 8-3-91, there's deposition testimony of Mr. Burns who said, After I reduced to practice in December of 94, I still didn't begin right away on Ski Path. Secondly, with regard to the SIA, Ski Industry of America, and whether they even had any interest in the authoring tool, there was not a demonstration of that. That's at 8-5-52. And, in fact, the testimony at 8-5-49 through 5-50 and 5-51 as well shows that the Ski Industry of America was not at all interested in the authoring tool, which shouldn't be too surprising because, after all, these are ski people. They're people who are selling skiing equipment or are into skiing, and they're not computer people. In fact, at the kiosk demonstration, which was a kiosk demonstration in January, not an authoring tool demonstration. At the kiosk demonstration in January, they didn't even have a technical person there. And the testimony was they didn't even care about and were indifferent to how the authoring tool might or might not work. Suppose at the show someone had come in and seen this demonstration, whatever you want to call it, and said, I'm interested in it. How soon can I get one? What would they say? They'd say, we have no idea. That's exactly what they would have said. There was no price for it. There was no offer for sale at the kiosk. It was something that was essentially being marketed there but not offered. The question is not the sale at the kiosk. The question is the use of the authoring tool. I agree, Your Honor. And at best, in the best light to the defendants, which is a flip-flop of the summary judgment standard, it's clear that there is an evidence on when the authoring tool was first used to create the kiosk, whether it was before or after the critical date.  And one final point, and that is we've been talking in our discussion today about really the method claims, and I would like to again underscore that. I think the error is clear in the apparatus claims as well, and in fact probably even clearer. But the apparatus, the judgment of Ansel Varsity apparatus claim must certainly be reversed because there was never any transfer of a computer-readable media with this program. There was never a transfer of hardware or software. At all times, control was kept over the kiosk system by multimedia adventures, and therefore our discussion of the method claims that we've had today, notwithstanding, I think the apparatus claims present an even clearer case for this error. Thank you, Mr. Stephenson. Thank you, Mr. Levin. The case is taken under submission. Thank you.